UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ANTONISE CRUZ,

    Plaintiff,

v.      Civ. No. 22-604 GJF/KK

BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF BERNALILLO and
BERNALILLO COUNTY HOUSING
DEPARTMENT,

    Defendants.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER is before the Court on Plaintiff's Motion for Preliminary Injunction [ECF 6 at 9–17] (Motion).[1] The Motion is fully briefed. *See* ECFs 16 (Resp.), 23 (Reply). On September 7, 2022, the Court held a hearing during which the parties presented evidence, including nine stipulated exhibits and testimony from three witnesses. *See* ECFs 29 (clerk's minutes), 32 (transcript), 33 (admitted exhibits 1–9). Fundamentally, the Motion raises the question of whether Plaintiff has established a "clear and unequivocal" right to the "extraordinary remedy" of a preliminary injunction—one that requires Defendants to reinstate Plaintiff's expired Section 8 housing voucher. As explained below, the Court concludes that Plaintiff has not established the right to such a remedy at this time. Consequently, the Court will **DENY** the Motion.

---

[1] Plaintiff's Motion, which was originally filed in state court, is found at ECF 6 (Plaintiff's Notice of Filing of State Record) at 9–17. The Court's citations to the Motion ("Mot.") refer to Plaintiff's own pagination at the bottom of her Motion (pp. 1–9) or her numbered paragraphs (¶¶ 1–15) and not the automated pagination at the top (pp. 9–17). In addition, although the Motion includes a request for a "temporary restraining order," the state court denied this request, *see* ECF 6 at 29–31, and Plaintiff confirmed that this request is now moot, *see* ECF 29 at 3. Consequently, the Court only considers Plaintiff's remaining request for a preliminary injunction, *see* Mot. at 1, 5–8.

**I. BACKGROUND**

Plaintiff is a 32-year-old mother of three [2] and currently lives with her brother in Albuquerque. Compl. [ECF 1-2]; Tr. [ECF 32] 51:15–20. She has been receiving social security disability benefits since the age of 22 based on a "primary diagnosis" of organic brain syndrome and a "secondary diagnosis" of learning disorder. Ex. 9.[3] On February 17, 2016, Defendants issued Plaintiff a Section 8 housing voucher for a two-bedroom housing unit. Ex. 1. Approximately two months later, on April 21, 2016, Plaintiff found a suitable housing unit that accepted this voucher. *Id.* After living in government-subsidized housing for more than two years, Plaintiff's voucher expired in June 2018. *Id.* Plaintiff testified that as of September 2018 she has no longer been living in government-subsidized housing. Tr. 55:24–56:1. The evidence as to where Plaintiff has been living since then, however, is somewhat vague. *See*, *e.g.*, Tr. 46:20–47:3, 51:15–52:13, 55:24–56:1. The Court is essentially left with Plaintiff's testimony that she has been living with her brother "probably [for] a few months" and before that she lived "just from place to place, like [with] family and friends." Tr. 51:19–23.[4]

---

[2] New Mexico's Children, Youth, and Families Department (CYFD) removed Plaintiff's children from her custody in or around August 2016, *see* Ex. 1, and the evidence presented during the hearing did not address with whom her children are currently living.

[3] *See also* ECF 6 at 19 (Affidavit of Plaintiff's mother, stating that "[b]ecause of her disability, [Plaintiff] has more trouble than the average person with the following: (a) keeping track of documents; (b) remembering appointments; (c) planning; (d) explaining her situation clearly; and (e) making decisions").

[4] Plaintiff also testified that there were times when she would live in a vehicle: "[if it was] like a friend I was staying at the time, it would be their vehicle or inside their house. Or if it was a family, it would be in their house or their vehicle." Tr. 52:3–13. There was no indication how often (or how voluntarily) Plaintiff switched from one friend or family's residence (or vehicle) to another—or how much time was spent living in residences versus vehicles, the types of residences and vehicles in which she lived, or why or how often she moved to a new family or friends' residence or vehicle. *See* Tr. 47:11–14 (Plaintiff agreeing with her counsel's characterization that she did not "stay[] at one place for a long time"—and that her living arrangement was "sort of an every-day thing").

### A. Plaintiff's June 2021 Voucher

Plaintiff remained without a housing voucher until June 7, 2021, when Defendants issued another voucher "for [her] and her children." ECF 6 at 19; Ex. 1. Plaintiff presented no specific evidence of the steps she—or her mother or grandmother—took to find a suitable housing unit during the initial 60-day window she was given.[5] Instead, the record simply shows that on August 2, 2021, she requested an extension because she knew that the voucher "was going to expire on August 7th of 2021." Tr. 59:6–17; Exs. 1, 6.[6] Per their policy, Defendants granted Plaintiff a 30-day extension. Exs. 1, 3. But the record contains no evidence of the steps Plaintiff, her mother, or grandmother took to secure housing until Friday, September 3, 2021—one business day before the 30-day extension expired. See Exs. 1–9; Tr. 46:17–96:9. Specifically, Plaintiff emailed Defendants at 3:44 p.m. on September 3, 2021, and stated she was "needing another extension due to its [sic] been difficult for [her] to find a place." Ex. 3.

On Tuesday, September 7, 2021, at 10:34 a.m., Defendants responded by email:

> Unfortunately, per policy only one 30-day day extension can be approved. Beyond this timeframe, the request would need to be due to an emergency. Examples [include] hospitalization, or death. Due to [the Memorial Day holiday on Monday, September 6, 2021], you will have until 5 pm today to turn in a moving package.

*Id.* Approximately 18 minutes later, Plaintiff responded that she was "dealing with a situation with [her] car being taken and other means with [her] getting denied for a[n] apartment so even if there can be a 15 day extension that would be great." *Id.* Plaintiff testified that, in light of this

---

[5] *See* ECF 6 at 19 (Affidavit of Plaintiff's mother, stating that "during the time [Plaintiff] was looking for housing, [she] needed a lot of help from [Plaintiff's mother] and [grandmother]"); Tr. 57:15–58:3 (Plaintiff testifying that "[her] mother helps [her] along with the paperwork or whatever [she] need help with"—"so [she] didn't need to ask for [a] reasonable accommodation from the housing authority").

[6] *See* Ex. 6 (Plaintiff's August 2, 2021, email to Defendants, stating she "need[s] an extension on [her] housing voucher due to [her] having a hard time finding a place to live" and that, although she had "been looking everywhere for a place," "most apartments/houses have either a waitlist or there [sic] property isn't available until mid September or October").

3

response, her mother drove her to the property management office around noon so she could pick up a moving packet (as she had previously misplaced her original packet). Tr. 68:11–13, 74:25–75:10, 84:21–87:22. She then testified that—within the space of about four hours—she and her mother found what appeared to be a suitable three-bedroom housing unit and returned to the property management office around 4:30 p.m. to turn in her paperwork. Tr. 68:11–70:8, 72:23–74:19, 84:18–85:10. Plaintiff further testified that, because one of the three bedrooms was a "detachable room" (i.e., a room that lacked a door or a heating and cooling unit), Defendants did not accept the paperwork. Tr. 68:11–70:8; *see also* Tr. 87:17–20.

### B. Additional Requests for a Voucher Extension

In addition to her emails on September 3rd and 7th, 2021, Plaintiff left Defendants several voicemails on September 7th, during which she stated that she "had covid and needed an extension due to this [illness]." Ex. 1; Tr. 43:16, 71:10–15; *see also* Tr. 60:6–61:19, 63:25–64:15 (Plaintiff acknowledging that, although she never tested positive or required hospitalization for covid, she experienced *covid-like* symptoms during July and August 2021—and also on September 3, 2021).[7] Defendants called Plaintiff back on September 7th and "told her [they] had the email [from earlier that day] but if she had covid also, [they] needed the medical records to prove this so that [they] could do the extension." Ex. 1. Consequently, Plaintiff sent Defendants screenshots of her medical records the following day, September 8th. *Id.*; Tr. 70:20–23. On September 15th, Defendants emailed Plaintiff that, although "[her] documentation … state[d] that [she] had COVID symptoms," she "[was] not hospitalized during [her] [voucher] search times"—let alone hospitalized in a manner that would have prevented her from "locat[ing] a [housing] unit." Ex.

---

[7] Plaintiff seemed to concede that she never notified Defendants of these symptoms until September 7, 2021. *See* Tr. 70:20–72:20. In addition, it appears that she only provided such notice *after* receiving Defendants' email earlier that morning, warning her that—unless there was an "emergency" such as "hospitalization"—her voucher would expire at 5:00 p.m. that day. *See* Exs. 1, 3; Tr. 68: 4–7, 70:20–72:20.

2. Consequently, Defendants informed Plaintiff that "[her] voucher ha[d] now expired" and "[a]n extension request [would] not be granted." *Id.*

Plaintiff's mother attested in an affidavit that "[a]round the time that [Plaintiff's] voucher expired, [she] called [Defendants] and left a lengthy voicemail, explaining that [Plaintiff] struggled due to her learning disability, … her recent illness[,] and multiple hospital visits, and ask[ed] them to extend her voucher." ECF 6 at 20.[8] Plaintiff's mother claimed that Defendants did not respond to this apparent voicemail. *Id.* Plaintiff's counsel thereafter sent Defendants a letter on November 16, 2021, "request[ing] that [Defendants] reinstate [Plaintiff's] voucher, as a reasonable accommodation of her disabilities, for a term of ninety days." Ex. 6. On November 22, 2021, Defendants responded that "the situation described by [Plaintiff] did not rise to the level of an emergency, and therefore, [Defendants] could not extend this voucher." Ex. 7. On April 21, 2022, Plaintiff's counsel sent to Defendants paperwork from the Social Security Administration as proof of Plaintiff's disabilities. Ex. 9. Defendants responded in May 2022, however, that they would not change their position because "[Plaintiff's] voucher expired before she requested a reasonable accommodation." Compl. at ¶¶ 52–53; Answer at ¶¶ 52–53.

### C. Instant Dispute

Plaintiff's Complaint contains two causes of action. Both Count I (violation of the Fair Housing Act (FHA)) and Count II (violation of the Americans with Disabilities Act (ADA)) allege

---

[8] *See also* Tr. 83:12–14 (Plaintiff's mother testifying that, in this voicemail, she stated that "[her] daughter has a disability and she struggles, and [her mother is] here to help her however [she] can[] [a]nd just -- again, just asking for the extension that was indeed needed, you know"). The Court found Plaintiff's mother's testimony about the timing of this alleged voicemail to be less than credible. *See*, *e.g.*, Tr. 81:9–83:14 (mother testifying, in response to questions by Defendants' counsel, that "[she] called before the voucher expired at 5:00 p.m. on September 7th"); Tr. 94:1–95:19 (mother agreeing with the characterization of Plaintiff's counsel that "[she] can't testify that [her call] was before September 7th," but that the call "was sometime very close to that date and probably … within a day or two"). In addition, aside from the mother's affidavit [ECF 6 at 20], there is no other documentary evidence that the mother ever left such a voicemail—or what precisely she would have said in this voicemail. *See* Exs. 1–9 (no reference, including in Defendants' call log, to such a voicemail—or to *any* calls by Plaintiff's mother).

5

that Defendants discriminated against Plaintiff by denying her "reasonable accommodation requests" for a voucher extension due to her disabilities. Compl. at ¶¶ 58–71 (Count I), ¶¶ 72–86 (Count II).[9]

About two weeks before Plaintiff's Complaint was removed to this Court, Plaintiff filed the instant Motion. This Motion requests that the Court issue a preliminary injunction requiring Defendants to (1) "reinstate [Plaintiff's] voucher, for an initial term of ninety days, as a reasonable accommodation of her disability," and (2) "memorialize [Plaintiff's] disabilities in her file and develop a plan to ensure that she has full access to its programs and services." Mot. at 1, 5–9.

## II. PARTIES' PRIMARY ARGUMENTS

Plaintiff contends that "justice requires a … preliminary injunction restoring [her] housing voucher." Mot. at 5–8; Reply at 1–17. She argues that such an injunction is justified for three reasons:

(1) "[Plaintiff] is already experiencing irreparable harm, as she is homeless," and "[t]his irreparable harm will continue if [her] voucher is not restored." Mot. at ¶¶ 9–10 (citing *McNeill v. NYC Housing Auth.*, 719 F. Supp. 233, 254 (S.D.N.Y. 1989));[10] Reply at 13–17.

---

[9] The Complaint also includes a section entitled "Count Three: Request for Declaratory and Injunctive Relief." Compl. ¶¶ 87–110 (Count III). Count III, however, does not allege any violation of federal or state law. Instead, Count III alleges only that Defendants violated their own internal "Administrative Plan" by not extending Plaintiff's voucher (1) as "a reasonable accommodation for [Plaintiff's] disabilities" or (2) for "reasons beyond the family's control, as determined by [Defendants]." *Id.* at ¶¶ 87–104 (quoting Administrative Plan). Although a significant portion of Count III requests declaratory and injunctive relief, *see id.* at ¶¶ 105–110, Count III does not allege that such a violation of an internal plan either amounted to a violation of federal law or otherwise entitles Plaintiff to relief. *See*, *e.g.*, *id.* at ¶ 104 (stating "[the] Court should find that [Defendants'] actions in this case violate its own Administrative Plan, which in turn violates 24 C.F.R. § 982.54(c)"); *but see* 24 C.F.R. § 982.54(c) (providing only that " [t]he [public housing authority] must administer the program in accordance with [its] administrative plan").

[10] *See McNeill*, 719 F. Supp. at 254 (stating that "[t]he threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable injury"); *cf. Johnson v. U.S. Dept. of Agric.*, 734 F.2d 774, 789 (11th Cir. 1984) (observing that "irreparable injury is suffered when one is wrongfully ejected from his home"); *Edwards v. Habib*, 366 F.2d 628, 630 (D.C. Cir. 1965) (Skelly Wright, J., Concurring) ("Certainly being evicted into the street is irreparable damage.").

(2) "There is a substantial likelihood that [Plaintiff] will prevail on the merits of her case, since [Defendants'] actions were in clear violation of [their] own Administrative Plan."  Mot. at ¶ 14; Reply at 4–13.[11]

(3) The balance of equities tips in her favor because (a) "Defendant will not be harmed by [such] a preliminary injunction;" (b) Defendants were "required … by law and by [Defendants'] Administrative Plan" to "restore [her] voucher" when Plaintiff "first requested the relief;" and (c) the requested injunction "is not adverse to the public interest" because "it is in the public interest to prevent homelessness."  Mot. at ¶¶ 11–13; Reply at 3–4, 17–18.

For their part, Defendants argue that Plaintiff's request to reinstate her voucher is "disfavored" for two reasons: it "changes the status quo and mandates action by [Defendants]." Resp. at 10–12.  In addition, Defendants contend that "Plaintiff has not shown that irreparable injury will result" were the Court to deny preliminary injunctive relief—given that Plaintiff (1) is not facing eviction; (2) "has allegedly been homeless since June 7, 2021;" (3) "ignores the numerous other housing options that exist in New Mexico;" and (4) will still have the same alleged disability that existed with her last (unsuccessful) 91-day voucher window.  Id. at 15–16.

Defendants also assert that "Plaintiff has not made the requisite 'strong showing' that there is a substantial likelihood she will succeed on the merits."  Id. at 12–15.  They emphasize that the Motion never discusses (or even references) the FHA or ADA—the statutes that comprise Plaintiff's "two (2) distinct causes of action"—and thus cannot show how a "violation of [Defendants'] internal policies amounts to a violation of [these statutes]."  Id. at 12–13.[12]

---

[11] Plaintiff claims that Defendants violated their Administrative Plan by their "refusal to extend [her] voucher and [their] subsequent refusal to reinstate her voucher" (or by omitting the plan's "due process" protections).  Mot. at ¶¶ 5–8.  She specifically asserts that such refusals (or such omission) violated the Plan because Defendants knew that (1) "'reasons beyond the family's control' [i.e., 'respiratory illness, loss of [Plaintiff's] vehicle[,] and an extremely tight housing market'] justif[ied] extensions under [Defendants'] Plan" and (2) Plaintiff had "requested reinstatement of [her] voucher as a reasonable accommodation of her disabilities."  Id. at ¶¶ 2–8; Reply at 4–13 (also asserting that Defendants' failure to make reasonable accommodations violated the ADA and FHA).

[12] Defendants further contend that even if such an internal policy violation "could amount to a violation of the FHA[] or the ADA," Defendants "did not violate [their] own policies and procedures" because (1) "there is absolutely no evidence that Plaintiff put [Defendants] on notice [before her voucher expired] that she had a disability or needed an accommodation for her alleged disability" and (2) Plaintiff's other alleged reasons for needing a second extension (i.e., "respiratory illness," loss of car, and "tight housing market") were "insufficient to justify a second extension of

7

Finally, Defendants argue that the balance of equities tips in their favor because (1) "Plaintiff's voucher was [properly] revoked and provided to another individual in need of housing" and (2) "[g]ranting Plaintiff another voucher for a 90[-day] period is adverse to the public interest because it will deprive another individual of [that] voucher."  *Id.* at 16–17.

## III. APPLICABLE LAW

### A. Preliminary Injunctions

The "limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'"  *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

"A plaintiff seeking a preliminary injunction must establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "A party seeking a preliminary injunction must prove that *all four* of the equitable factors weigh in its favor."  *Id.* at 1278 (emphasis in original) (quotation omitted).  "The first two factors … are the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), and the second factor is "the single most important prerequisite for the issuance of a preliminary injunction," *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quotations omitted).  In addition, "the final two factors 'merge when the Government is the opposing party.'"  *Denver Homeless*, 32 F.4th at 1278 (quoting *Nken*, 556 U.S. at 435); *see Nken*, 556 U.S. at 435–36 (observing that "weighing the public interest" is simply part of balancing the equities when "the Government is the opposing party").

---

her voucher."  Resp. at 12–14.

8

"A preliminary injunction is an *extraordinary remedy* that 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Id.* at 1278 n.15 (emphasis added) (quoting *Winter*, 555 U.S. at 23).[13] The Tenth Circuit "review[s] the district court's decision to deny a preliminary injunction for abuse of discretion." *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 899 (10th Cir. 2022). And "[a]n abuse of discretion occurs where a decision is premised on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Denver Homeless*, 32 F.4th at 1278 (quoting *State v. U.S. Env't. Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021)).

### B. Mandatory Preliminary Injunctions

"Preliminary injunctions are typically 'prohibitory' in the sense that they prohibit the defendant from doing something." *Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll.*, 23 F.4th 1262, 1274 (10th Cir. 2022). "Other injunctions are considered 'mandatory' when they 'affirmatively require' action." *Id.* at 1275 (quotation omitted). Specifically, a mandatory injunction "affirmatively requires the nonmovant to act in a particular way, and as a result … places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Schrier*, 427 F.3d at 1259 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 979 (10th Cir. 2004)).

A mandatory preliminary injunction is one of the "three types of specifically disfavored preliminary injunctions." *Id.*[14] Such an injunction is an "extraordinary step," *Trial Laws. Coll.*,

---

[13] *See also FLDS v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012) (observing that "because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal").

[14] The other two types of disfavored preliminary injunctions are those that (1) "alter the status quo" or (2) "afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012). The status quo in this context is considered "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Schrier*, 427 F.3d at 1260 (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001)).

23 F.4th at 1275, that "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (quoting *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1048–49 (10th Cir. 2007)). For instance, "[a] district court may not grant" a mandatory (or other disfavored) injunction "unless the moving party makes a *strong showing* both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* at 1125–26 (emphasis added) (quoting *Summum*, 483 F.3d at 1049).

### C. Irreparable Harm

"[B]efore the other requirements [of a preliminary injunction] [are] considered," the moving party must "first demonstrate that [irreparable harm] is *likely*"—a showing that is "the single most important prerequisite." *DTC Energy*, 912 F.3d at 1270 (emphasis added) (quotations omitted). In other words, "simply showing some possibility of irreparable injury fails to satisfy the second factor" because "the 'possibility' standard is too lenient." *Nken*, 556 U.S. at 434 (quotations omitted).

"Demonstrating irreparable harm is not an easy burden to fulfill." *DTC Energy*, 912 F.3d at 1270 (quoting *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017)). This is because "[t]he purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from *irreparable* injury that will *surely result* without [its] issuance." *Id.* (emphasis added) (quoting *Schrier*, 427 F.3d at 1267). Consequently, "the movant must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Id.* (quoting *First W. Capital*, 874 F.3d at 1141).[15]

---

[15] "The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended … are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (emphasis in original) (quotation omitted).

**D. Success on the Merits**

Plaintiff must "establish that [she] is *likely* to succeed on the merits." *Denver Homeless*, 32 F.4th 1277 (emphasis added); *see also Nken*, 556 U.S. at 434 (observing that "[i]t is not enough that the chance of success on the merits be better than negligible"—as "more than a mere possibility of relief is required" (quotations and alternations omitted)). Consequently, the Court addresses the ADA and FHA, as Plaintiff alleges Defendants violated these statutes when they "fail[ed] to provide reasonable accommodations for her disabilities." Compl. at 1.

    1. Americans with Disabilities Act

Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 12132; *see also Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) (noting the ADA's directive that "no 'public entity' can discriminate against any 'qualified individual with a disability'" (quotation omitted)).[16]

"To have a viable claim [under Title II of the ADA], a plaintiff must prove:"

> (1) that he or she is a qualified individual with a disability; (2) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was *by reason of the plaintiff's disability*.

*J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016) (emphasis added) (quoting *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999)).[17]

---

[16] A "qualified individual with a disability" is an individual (1) "with a disability" who (2) "meets the essential eligibility requirements for the receipt of services or the participation in programs … provided by a public entity." 42 U.S.C. § 12131(2); *see also* § 12102(1) (defining "disability" as, *inter alia*, "a physical or mental impairment that substantially limits one or more major life activities of such individual").

[17] "[C]ourts have recognized two types of [such viable ADA] claims: (1) exclusion from or denial of benefits and (2) discrimination." *J.V.*, 813 F.3d at 1295.

11

In addition, "to establish a discrimination claim" under the ADA, a plaintiff must also prove "(1) intentional discrimination (disparate treatment); (2) disparate impact ['generally shown by statistical evidence']; [or] (3) failure to make a reasonable accommodation." *Id.* at 1295–1300 (quotation omitted). As to the reasonable accommodation factor, a plaintiff must show that "[a] public entity … [knew] that the individual [was] [1] disabled and [2] require[d] an accommodation of some kind to participate in or receive the benefits of its services." *Id.* at 1299 (quotation omitted).[18] Furthermore, "a public entity … knows that an individual requires [an accommodation]" when "th[e] need [for an accommodation] is obvious" or "the individual requests an accommodation." *Id.* (quotation and brackets omitted).[19]

### 2. Fair Housing Act

The Fair Housing Act, 42 U.S.C. §§ 3601-3619, "makes it unlawful 'to refuse to sell or rent or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status or national origin,' or because of handicap." *Reinhart v. Lincoln County*, 482 F.3d 1225 (10th Cir. 2007) (quoting § 3604(a)) (citing § 3604(f)(1)). Under the FHA, "[d]iscrimination may occur either by disparate treatment or disparate impact." *Id.* (quotation omitted).[20]

---

[18] The applicable "ADA regulations require public entities to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.'" *J.V.*, 813 F.3d at 1299 (quoting 28 C.F.R. § 35.130(b)(7)). But no such modification is required if "the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

[19] *See also Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007) ("A public entity cannot know that a modification to its services under the ADA is necessary if it does not first understand that an individual requires such modification *because* he is disabled." (emphasis in original)).

[20] "A disparate-treatment claim requires proof of differential treatment of similarly situated persons or groups, [and] the discrimination must be intentional." *Id.* (quotation omitted). "A disparate-impact claim, on the other hand, challenges a facially neutral policy that actually or predictably results in discrimination," *id.* (quotations and alteration omitted), and "is generally shown by statistical evidence," *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 922 (10th Cir. 2012) (quotation omitted).

"Additionally, 'a refusal to make reasonable accommodations in rules, policies, practices, or services' as may be '*necessary* to afford handicapped persons equal opportunity to use and enjoy a dwelling' is prohibited" under the FHA.  *Id.* (emphasis added) (quoting 42 U.S.C. § 3604(f)(3)(B)) (brackets omitted).  "Put simply, [this provision of the FHA] statute requires accommodations that are *necessary* (or indispensable or essential) to achieving the objective of equal housing opportunities between those with disabilities and those without."  *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 923 (10th Cir. 2012) (emphasis added).  Indeed, "the point of the reasonable accommodation mandate [is] to require changes in otherwise neutral policies that preclude the disabled from obtaining the same opportunities that those without disabilities automatically enjoy."  *Id.* (quotation omitted).

## IV. ANALYSIS

As discussed below, Plaintiff has not made the necessary showing that she is entitled to a preliminary injunction requiring Defendants to either (1) reinstate her housing voucher or (2) document her disabilities and develop a plan to address her access to Defendants' programs.

### A. Requested Injunction Is Specifically Disfavored

Plaintiff's requested injunction, if granted, would "affirmatively require[] [Defendants] to act in a particular way."  *O Centro*, 389 F.3d at 979.  Specifically, the injunction would mandate that Defendants (1) "reinstate [Plaintiff's] voucher, for an initial term of ninety days" and (2) "memorialize [Plaintiff's] disabilities in her file and develop a plan to ensure that she has full access to its programs and services."  Mot. at 8–9; *see also* Reply at 3 (Plaintiff acknowledging that "the order would require Defendant[s] to take a particular action").

Plaintiff, however, asserts that such an injunction is not truly mandatory because it would only require Defendants to do what they are "expected to [do] on a routine basis:" granting

"extension requests" and following their "own Administrative Plan." *Id*. But while Defendants may "routinely" extend the voucher window from 60 to 90 days or have a "pre-existing" duty to comply with the ADA and FHA and their internal regulations, *id.*, the requested injunction goes further. Specifically, it would affirmatively require Defendants to grant Plaintiff a second bite at the "90-day-window" apple—over a year after that window has closed. Such a mandate would disregard both Plaintiff's subsequent efforts (or lack thereof) to apply for a new voucher and where she would otherwise stand in the voucher waiting line.[21] Furthermore, the requested injunction is only for an "initial" term, suggesting that the Court may potentially find itself having to supervise subsequent (or requests for subsequent) voucher terms. In addition, such an injunction would also affirmatively require Defendants to do something else: develop an (unspecified) plan for her access to Defendants' services—which again would put the Court "in a position where it may have to provide ongoing supervision to assure [Defendants] [are] abiding by the injunction." *O Centro*, 389 F.3d at 979.

In sum, the requested mandatory preliminary injunction is a "specifically disfavored preliminary injunction[ ]." *Schrier*, 427 F.3d at 1259. Consequently, Plaintiff must make "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Summum*, 483 F.3d at 1049.[22]

---

[21] Plaintiff presented no evidence of any subsequent efforts to obtain a new voucher, her intent to even apply for one, or what opportunities existed since September 2021 to apply for one. *See also* Tr. 37:25–38:8 (Housing Department Director confirming that "if you're awarded a voucher that expires, you still have the opportunity to apply once again;" that "[the] waiting list is open until September 16th [2022];" and that Defendants were "currently taking applications again").

[22] Nevertheless, the Court "need not [unduly] probe this issue because, regardless of whether [Plaintiff's] requested injunction falls into the … category of disfavored injunctions, Plaintiff[] cannot show that [she] [is] likely to succeed on the merits"—or that the other applicable factors (i.e., likelihood of irreparable harm and balance of equities) weigh in her favor. *Diné Citizens Against Ruining Our Env't v. Bernhardt*, No. 1:19-CV-00703-WJ-JFR, 2021 WL 3370899, 2021 U.S. Dist. LEXIS 145940, at * 48 (D.N.M. Aug. 3, 2021). The Court will therefore conduct its analysis "as though the proposed preliminary injunction is not the type disfavored under controlling Tenth Circuit precedent." *Id.*

### B. Plaintiff Has Not Established Likelihood of Irreparable Harm

Plaintiff contends that she "is already experiencing irreparable harm, as she is homeless," and that such harm "will continue if [her] voucher is not restored." Mot. at ¶¶ 9–10.[23] The Court is deeply sympathetic to the difficult life circumstances in which Plaintiff finds herself. Nevertheless, the Court must apply the law, which requires Plaintiff to "demonstrate a *significant risk* that [she] will experience harm that cannot be compensated after the fact by money damages," *First W. Capital*, 874 F.3d at 1141 (emphasis added), before the Court can impose the "extraordinary remedy," *Winter*, 555 U.S. at 23, of a preliminary injunction. Here, Plaintiff has not demonstrated that "[she] is likely to suffer irreparable harm in the absence of preliminary relief," *id.* at 20—a requirement that "is not an easy burden to fulfill." *First W. Capital*, 874 F.3d at 1141; *see also Nken*, 556 U.S. at 434 (observing that "simply showing some possibility of irreparable injury" is insufficient).

Although Plaintiff suggests otherwise, *see* Mot. at ¶¶ 9–10, she has not demonstrated that her only options are either (1) living homeless on the street or (2) living in a government-subsidized housing unit funded by Defendants' reinstated housing voucher. For instance, she testified that she has been living with her brother for at least a few months and previously lived with other family members as well as friends (in both their homes and vehicles). Tr. 46:20–47:3, 51:15–52:13, 55:24–56:1. In addition, as Defendants point out, she does not address the feasibility of "other housing options that exist in New Mexico." Resp. at 15–16.

---

[23] Plaintiff's use of the term "homeless" appears to include not just the (unspecified number of) days when she has lived in (unspecified) vehicles belonging to her, her (unidentified) family members, or her (unidentified) friends. Instead, her use of this term also appears to include the (unspecified number of) months in which she has been living in a housing unit with her brother—as well as the (unspecified) time she has been living in the homes of presumably other (unidentified) family members and (unidentified) friends. *See* Tr. 46:20–47:14, 51:15–52:13; Mot. at ¶ 10; Reply at 13–15.

More pertinently, she has not demonstrated that—without an injunction ordering Defendants to reinstate her housing voucher for 90 days (and to develop a plan for her access to their services)—she will suffer an irreparable injury (i.e., "harm that cannot be compensated after the fact by money damages," *First W. Capital*, 874 F.3d at 1141).  Although she speaks in general terms about "the harm of homelessness," *see*, *e.g.*, Reply at 14–15, Plaintiff has not presented evidence demonstrating what *irreparable* injury *she* is likely to suffer without this 90-day voucher. While Plaintiff's current living arrangements might not be ideal, the Court is left with insufficient evidence to conclude that the next-best (but unspecified) alternatives to the voucher-subsidized housing are irreparably harmful.  For instance, unlike the Plaintiff in *McNeill*, Plaintiff presented no evidence that she is facing "[t]he threat of eviction" onto the street.  719 F. Supp. at 254. Neither has she presented any evidence to persuade this Court that she cannot keep living with her brother until a better option becomes available (or that doing so will irreparably harm her)—or that other housing options (that are not irreparably harmful) are foreclosed to her.[24]

Instead, the evidence presented to the Court demonstrates that—for more than one year since the expiration of the housing voucher—Plaintiff has found alternative housing arrangements. The Court received no evidence that Plaintiff's ability to continue doing so while this case is pending will be compromised.  All of this leads the Court to conclude that money damages and injunctive relief awarded at the end of the case would be sufficient to remedy whatever injuries Plaintiff can prove that Defendants have caused her.

In sum, Plaintiff has not shown that she will likely suffer irreparable injury if the Court denies a preliminary injunction mandating, *inter alia*, a 90-day reinstatement of her voucher.

---

[24] *Cf.* Tr. 37:17–24 (Housing Director testifying that "[o]utside of the housing voucher program" there are "other options for individuals in Bernalillo County to obtain housing"—such as "the Homelessness Coalition," "day shelters," "Catholic Charities," and "other organizations that also have vouchers").

16

### C. Plaintiff Has Not Established Likelihood of Success on Merits

Because Plaintiff has not established the likelihood of irreparable harm, the Court need not address the likelihood of success on the merits or the balance of equities. *See Denver Homeless*, 32 F.4th at 1277 (observing that "[a]n injunction can issue only if each factor is established"). Nevertheless, for the sake of completeness, the Court briefly addresses these remaining two factors.

The Court concludes that Plaintiff has not established that "[she] is likely to succeed on the merits." *Winter*, 555 U.S. at 20. As to the ADA, Plaintiff has not shown that it is likely that she was "denied the benefit[]" of a further housing voucher extension "*by reason of [her] disability*." *J.V.*, 813 F.3d at 1295 (emphasis added). Based on the evidence presented, the Court finds that the expiration of Plaintiff's voucher was not likely the result of her *disability*—but rather her delay in commencing her housing search. The Court received strong evidence that Plaintiff indeed has the capacity to remember Defendants' deadlines and to find a suitable housing unit—and to do so remarkably quickly, particularly with the help of her mother. *See supra* Section I. For instance, in early 2016—nearly four years after her disability began—Plaintiff obtained suitable housing within the initial 60-day window, without ever needing the automatic first extension. *See* Ex. 1, 9; Tr. 53:1–54:10. Moreover, with respect to 88 of the 91 days her most recent voucher was active, the record is essentially devoid of evidence that Plaintiff or her mother took *any* specific steps to pursue a suitable housing unit. *See* Tr. 46:17–96:9; *supra* note 6. But when the voucher was about to expire, Plaintiff acted quickly. As noted, she asked for an extension (on August 2nd and September 3rd) and then diligently searched for and found what seemed to be a suitable housing unit (on September 7th, within hours of the deadline expiring). And no evidence was presented that her *disability* prevented her from searching for housing during the previous 88 days.

In addition, the evidence did not show that Plaintiff—who was able to find housing in less than one day and failed to use about 96.7 percent (88/91) of the previous 91-day window—needs *another* 90 days to search for a house, particularly as a reasonable accommodation of her disability.[25]

After thoroughly reviewing the evidence, the Court finds that Plaintiff has failed to establish a causal link between her disability and the expiration of her voucher. In other words, she has failed to show that she was denied the benefit of a voucher extension due to her disability. Instead, the evidence showed that the expiration of the voucher was likely the result of Plaintiff simply waiting until the last minute to ask for an extension and to seriously look for a housing unit, rather than a defect in her memory or her document tracking, communicating, organizing, or decision-making skills. *See supra* Section I(a); ECF 6 at 19 (affidavit of Plaintiff's mother). Furthermore, the evidence showed that Plaintiff was not denied the voucher extension because of her disability, but instead because she failed to provide qualifying "reasons beyond the family's control" or request (implicitly or explicitly) an extension as "a reasonable accommodation" of a disability. *See supra* Section I(b).

Moreover, Plaintiff has not established that Defendants likely *knew* that she had a disability that "required an accommodation of some kind" for her to receive the benefits of the housing voucher. *J.V.*, 813 F.3d at 1299. The Court did not find the testimony of Plaintiff's mother

---

[25] Although Plaintiff claims that "respiratory illness, loss of her vehicle and an extremely tight housing market" affected her housing search, Mot. at ¶ 3, such challenges are not a result of discrimination based on her alleged disability. Furthermore, Plaintiff presented no evidence on the number of days such challenges might have precluded her from looking for housing—and she presented very little evidence addressing how these challenges specifically affected her ability to obtain housing, whether on September 7th or the three months preceding it. *See*, *e.g.*, Tr. 60:6–61:19, 63:25–64:15 (Plaintiff acknowledging that she experienced covid-like symptoms during July, August, and at least early September 2021), 34:23–35:11 (Housing Director testifying that Defendants "do not grant extensions for car problems," particularly as such problems are "pretty common"), 89:6–22 (Plaintiff's mother acknowledging that "[Plaintiff's] car being taken wasn't impeding her ability to find housing on September 7th"); Exs. 1–9 (no exhibits addressing the local housing market in the summer of 2021 and its impact on voucher recipients).

18

sufficiently credible to conclude that her voicemail—allegedly left "around the time" Plaintiff's voucher expired—put Defendants on notice that Plaintiff needed a voucher extension/reinstatement as a reasonable accommodation of her disability. *See supra* Section I(b).[26] In addition, although the subsequent correspondence from Plaintiff's counsel clearly notified Defendants of Plaintiff's alleged disability, there is insufficient evidence to conclude that a voucher extension is a likely "reasonable accommodation" for an alleged disability that did not cause the expiration of the voucher. Consequently, the Court concludes that Plaintiff has not established that she is likely to succeed on the merits of her ADA claim.

These same evidentiary concerns persist in the Court's assessment of Plaintiff's FHA claim. As a result, the Court finds that Plaintiff has not established that the requested 90-day voucher extension is "*necessary* (or indispensable or essential) to achieving the objective of equal housing opportunities between those with disabilities and those without." *Cinnamon Hills*, 685 F.3d at 923 (emphasis added). As illustrated above, the evidence before the Court lacks a causal connection between Plaintiff's alleged disability and the expiration of the housing voucher.

For these reasons, the Court concludes that Plaintiff has not established a likelihood of success on the merits.

### D. Plaintiff Has Not Established that Balance of Equities Tips in Her Favor

Plaintiff has not established that the balance of equities tips in her favor. Although she argues that the requested injunction will not harm Defendants, Mot. at ¶ 11–12, the evidence shows that such an injunction would indeed make it more difficult for Defendants to receive funding.[27]

---

[26] The evidence at the hearing left the Court with many open questions, including whether the call was actually made, whether the voicemail was actually left, whether the voicemail was ever heard, or why Plaintiff's mother never made a second or subsequent call, sent an email, or made an in-person visit to Defendants' office.

[27] *See* Tr. 31:19–33:9 (Housing Director testifying: "And HUD [U.S. Department of Housing and Urban Development] requires that I lease up to this budget each year by 97 percent. If I do not do this at the end of every year, HUD starts taking money away from the community. So … every month, I'm looking at this budget and what

Thus, although "it is in the public interest to prevent homelessness," *id.* at 13, the Court finds that Defendants are better able to pursue their mission of decreasing homelessness when they are fully funded and able to provide vouchers to those who are able to timely use them.  In addition, as discussed above, Plaintiff's voucher did not expire (or fail to qualify for an extension) because of her disability—but rather because of her inexcusable failure to meet Defendants' conditions for a voucher extension.  And she has failed to show that she will likely suffer irreparable injury if the Court denies a preliminary injunction.  Under the circumstances, Defendants' equities in maximizing their funding streams and the number of vouchers they can issue to qualified recipients capable of timely using them are at least as strong as are Plaintiff's equities.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has not established a right to the extraordinary remedy of a preliminary injunction.

**IT IS THEREFORE ORDERED** that the Motion is **DENIED**.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*

---

my lease-up does. So I'm extremely sensitive to what voucher expiration does and how much lease-up I have, and what's expiring. . . . So you can't have vouchers out there ultimately forever, or long extensions of time, because you never meet that lease-up mark.")